# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**RUSSELL G. RIENAS,**

      **Plaintiff,**

      **v.**                            **Case No. 22-CV-863**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

      **Defendant.**

---

## DECISION AND ORDER

---

Russell G. Rienas seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his Title II application for a period of disability and disability insurance benefits. For the reasons explained below, the Commissioner's decision is affirmed, and the case is dismissed.

## BACKGROUND

On November 14, 2018, Rienas filed a Title II application for a period of disability and disability insurance benefits alleging disability beginning on March 3, 2012 due to heart disease/angina, depression and PTSD, medication side effects, back and hip pain, skin conditions, and sleeping disorders. (Tr. 213.) Rienas' date last insured is December 31, 2017. (Tr. 4331.) Rienas' claim was denied initially on March 19, 2019 and upon reconsideration on July 2, 2019. (Tr. 81.) Rienas filed a request for a hearing, and a hearing was held before Administrative Law Judge ("ALJ") Chad Gendreau on April 9, 2020. (*Id.*) Rienas, represented by counsel, testified at the hearing, as did Kenneth Jones, a vocational expert ("VE"). (Tr. 10–49.)

In a written decision issued May 13, 2020, ALJ Gendreau found that Rienas had the severe impairments of obesity, coronary artery disease with hypertension and hyperlipidemia, depression, and anxiety. (Tr. 83.) He found that Rienas did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 84–86.) ALJ Gendreau further found that through the date last insured, Rienas had the residual functional capacity ("RFC") to perform light work with the following limitations: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; have occasional exposure to dust, odors, fumes, and pulmonary irritants; limited to simple, routine, and repetitive tasks; limited to simple work-related decisions; and can have occasional interaction with others. (Tr. 86.)

ALJ Gendreau found that through the date last insured, Rienas could not perform his past relevant work as a security guard. (Tr. 91.) However, he determined that based on Rienas' age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that he could perform. (Tr. 92–93.) Thus, ALJ Gendreau found that Rienas was not disabled from March 3, 2012, the alleged onset date, through December 31, 2017, the date last insured. (Tr. 93.) The Appeals Council denied Rienas' request for review (Tr. 1–5), and Rienas filed a complaint in District Court on November 21, 2020, Case No. 20-CV-1746 (E.D. Wis.) (Tr. 4390–91). The parties jointly moved to remand the case for further proceedings (Tr. 4419) and on August 17, 2021, United States District Judge Brett Ludwig remanded the case (Tr. 4420).

The Appeals Council issued an order on October 13, 2021, stating that upon remand, the ALJ must reevaluate Rienas' mental impairments, consider the medical source opinions

and prior administrative medical findings, further consider the RFC, and, if warranted, expand the record. (Tr. 4425–26.) Upon remand, the case was returned to ALJ Gendreau, who held an additional hearing on February 1, 2022. (Tr. 4352–81.) Rienas, again represented by counsel, testified at the hearing, as did VE Sheila Capizzii. (*Id.*)

ALJ Gendreau issued a new decision on March 2, 2022. (Tr. 4330–44.) In this new decision, ALJ Gendreau found that Rienas had the severe impairments of obesity and coronary artery disease with hypertension and hyperlipidemia. (Tr. 4333.) This time in considering Rienas' medically determinable mental impairments of anxiety and depression, ALJ Gendreau found that, considered singly and in combination, these impairments did not cause more than minimal limitations in Rienas' ability to perform basic mental work activities and therefore were non-severe. (*Id.*) He found that in the four broad functional areas known as the "paragraph B" criteria, Rienas had no limitation in his ability to understand, remember, or apply information; mild limitation in the ability to interact with others; mild limitation in the ability to concentrate, persist, or maintain pace; and mild limitation in the ability to adapt or manage oneself. (*Id.*) Given this finding, the ALJ did not limit Rienas' RFC based on his mental impairments. Rather, after finding Rienas did not meet a listing (Tr. 4337), he determined Rienas had the RFC to perform light work with the following exceptions: cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch, and crawl; and is limited to occasional exposure to dusts, odors, fumes, and pulmonary irritants (Tr. 4337–42).

Once again, ALJ Gendreau found that through his date last insured, Rienas was unable to perform his past relevant work as a security guard; however, given his age, education, work experience, and RFC, jobs existed in significant numbers in the national

3

economy that Rienas could perform. (Tr. 4342–43.) As such, ALJ Gendreau found Rienas was not disabled from his onset date of March 3, 2012 through his date last insured, December 31, 2017. (Tr. 4344.) The Appeals Council again denied review (Tr. 4319–25), making the ALJ's decision the Commissioner's final decision. Rienas now appeals the March 2, 2022 denial of benefits.

## DISCUSSION

### 1.     *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered

4

by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

    2.    *Medical Evidence*

Rienas served in the military for approximately fifteen years until he was medically released in 2001. (Tr. 410.) Rienas first began experiencing symptoms of depression and anxiety while he was in the military, and noted towards the end of his time in service that he worked as a recruiter and experienced a great deal of stress with the position. (Tr. 410–11.) The record contains treatment notes with psychiatrist Brian DeMuri, MD, dating back to early 2004. (Tr. 3623, 3625.) After his discharge from the military, Rienas found work through a contract company with Homeland Security. (Tr. 411.) Rienas found the work meaningful and thought his symptoms were improving. In fact, Dr. DeMuri noted on July 20, 2007 that Rienas' depression was "in remission." (Tr. 3778.)

Rienas asserts that things changed in late 2010 when he needed open heart surgery. (Tr. 411.) Rienas treated with cardiologist Dr. Russell Dabrowski, and the records indicate that Rienas was diagnosed with coronary artery disease and underwent coronary bypass surgery in October 2010. (Tr. 888.) Rienas also had a postoperative heart catheterization procedure in late January 2011. (*Id.*) In January 2011, Dr. DeMuri noted that Rienas experienced a "relapse of depression" since his surgery. (Tr. 921.) Also in 2011, Rienas was referred by Dr. DeMuri to psychologist Benjamin D'Angelo, PhD for therapy to treat his anxiety and depression. (Tr. 864.) In September 2011, Dr. D'Angelo noted that Rienas presented with an increase in anxiety and depression since his October open heart surgery (Tr. 864–65); however, Rienas indicated that he was "feeling better lately" (Tr. 865). In December 2011, Rienas told Dr. D'Angelo that "he was tired of not talking about how he

5

really was, and that he [had] not been genuine in describing the extent of his distress." (Tr. 859.) Rienas stated that he had been feeling "quite depressed and anxious" about his heart condition. (*Id.*) Around this same time, Rienas reported having decreased activity tolerance and increased chest discomfort during the past few months and wanted to move up his appointment with Dr. Dabrowski. (Tr. 857.) Although Rienas was offered an appointment at the cardiac clinic the following day, Rienas declined the appointment as he was reticent to miss work. (*Id.*)

On December 22, 2011, Rienas underwent a repeat cardiac catheterization procedure. (Tr. 2343.) Rienas was discharged from the hospital the next day (Tr. 817) and by December 28, he stated that he was doing well and had returned to work (Tr. 805). In February 2012, Dr. Dabrowski noted that Rienas was stable and doing well, with only rare anginal episodes that were well-controlled with nitroglycerin. (Tr. 802.) Around the same time, Dr. D'Angelo noted that Rienas was feeling better, though he was still concerned about his heart. (Tr. 801.) They discussed coping strategies for his health-related anxiety. (*Id.*)

In March 2012 (the alleged disability onset date), Rienas was terminated from his security position with Homeland Security. (Tr. 4361.) He asserts that he "crashed and burned" when this happened. (*Id.*) In May 2012, Rienas told Dr. D'Angelo that he believed he was fired because his past mental health treatment came up on a background check. (Tr. 790.) He stated that he tried some assembly work in the interim but had some physical problems doing it and was now "taking some time to think about what he should do." (*Id.*) Dr. D'Angelo recommended increasing the frequency of their appointments to deal with his increased depression due to the job loss. (*Id.*) During the next few months, Rienas continued to report to both Drs. DeMuri and D'Angelo feeling down, and Dr. DeMuri recommended

considering a trial of Wellbutrin along with the Zoloft he was currently taking for his mental health symptoms. (Tr. 776–77, 779, 786–89.) As to his cardiac health, however, in July 2012 Rienas indicated to Dr. Dabrowski that he was feeling fairly well, having only occasional anginal episodes and becoming short of breath only with more significant forms of activity. (Tr. 778.) Dr. Dabrowski described Rienas' condition as "satisfactory" and recommended only yearly follow-up visits. (Tr. 778–79.)

Rienas applied for United States Department of Veterans Affairs ("VA") disability benefits and Rienas underwent a VA compensation and pension ("C&P") exam with Dr. Kenneth Sherry in August 2012. (Tr. 770–76.) Dr. Sherry opined that Rienas' level of occupational and social impairment was best summarized as an "occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation." (Tr. 773.) Dr. Sherry, however, concluded as follows:

> Pt does remain employable. The loss of the Homeland position was very difficult. Unfortunately he remains relatively limited in his activity. His sedate lifestyle exacerbates the depression. Employment would significantly benefit his mood. He should be reliable. He is cognitively intact. Socially he should be able to manage adequately. No memory deficits are known.

(Tr. 776.) On August 23, 2012, Dr. DeMuri noted that Rienas' mood was "residual depressed" and that Rienas worried about his physical health and its negative impact on his ability to work. (Tr. 744.) On August 30, Rienas told Dr. D'Angelo that he had been feeling better, which he attributed to the change in medication. (Tr. 742.) His mental status examination findings were normal. (*Id.*) In November, Rienas reported to Dr. DeMuri that his medication helped to manage his mood. (Tr. 726.) His mental status examination was again normal. (*Id.*)

7

On April 17, 2013, Dr. DeMuri wrote a letter on behalf of Rienas' social security disability claim. (Tr. 720.) He stated that Rienas' chronic service-connected physical disabilities would continue to negatively impact his chronic service-connected mental disabilities, and vice versa. (*Id.*) Dr. DeMuri stated that Rienas' mood problems made it difficult for him to consistently sustain daily function on an ongoing basis and that stress contributed to his exacerbations. (*Id.*) Thus, he opined that maintaining gainful employment to a reliable degree was not a dependable outlook for the future. (*Id.*) He found that Rienas' "residual symptoms and exacerbations of mood instability are significant and can flare up quite frequently with or without stress and triggers." (*Id.*) Dr. DeMuri concluded his letter as follows:

> Through your strong efforts you have managed to maintain the abilities that you do have. It is my impression though that you suffer more than what appears on the outside and that resilience for coping and stress management is diminishing. I respectfully submit that this be taken into consideration on the matter before you. Furthermore, you have served this country bravely and honorably in the armed services. As such, in the spirit of giving back to those you have served, I ask that you be granted the benefit of any doubt.

(Tr. 721.) Rienas treated with Dr. DeMuri on the same date his letter was drafted. (Tr. 718.) During this session, Dr. DeMuri noted that while Rienas' mood was irritable, his mental status examination was otherwise normal. (Tr. 719.) Rienas maintained self-care and his wife, who was present at the session, concurred with the assessment. (*Id.*) His Wellbutrin was increased. (*Id.*)

On May 13, 2013, Rienas again treated with Dr. DeMuri. (Tr. 700–01.) Dr. DeMuri noted that Rienas' medications helped to manage his mood and his mental status examination was normal. (Tr. 701.) His medications were continued. (Tr. 702.) His wife was again present and concurred with the assessment. (Tr. 701.) In late July, Rienas treated with both his

8

primary care practitioner and Dr. Dabrowski. (Tr. 689, 691.) Rienas reported to nurse practitioner Gary Kunz that he "mainly take[s] care of [his] grandchild." (Tr. 692.) Dr. Dabrowski noted that Rienas continued to have only occasional chest symptoms that may or may not be anginal in nature and while he complained of fatigue and exertional dyspnea on occasion, the symptoms could be related to his anxiety and depression. (Tr. 689.) Dr. Dabrowski concluded that Rienas was doing satisfactorily from a cardiac standpoint. (Tr. 690.)

While Rienas continued to treat with Dr. DeMuri for medication management throughout the next several years, he did not engage in therapy with Dr. D'Angelo or any other provider. In September 2013, Dr. DeMuri noted that the medications help manage Rienas' mood and that his mood varied with stressors; however, he found that Rienas' mental status examination was normal and that Rienas could schedule counseling with Dr. D'Angelo "at his discretion" as needed. (Tr. 682–83.) Rienas treated with Dr. DeMuri several times in 2014. In January, Rienas reported that Wellbutrin was not providing as strong of a benefit, so Dr. DeMuri recommended tapering it and switching to Remeron. (Tr. 674–75.) In April, Dr. DeMuri noted that Rienas' mood was managed by medication and his mental status examination was normal. (Tr. 668–69.) Dr. DeMuri concluded that Rienas' mental health medication management was "sufficient." (Tr. 670.) In August at his yearly physical, NP Kunz noted "doing well" by "depressive disorder" and "seeing Dumri [sic] at times" by "anxiety." (Tr. 662.)

Also in August, Rienas treated with Dr. Dabrowski for his annual cardiac appointment. (Tr. 659.) Dr. Dabrowski noted that Rienas had done fairly well over the past year, experiencing occasional chest or throat symptoms that could be anginal, but were

9

relieved by resting. (*Id.*) He also noted that the occurrences "relate to not taking his medications or performing very strenuous physical activity" while with "normal day-to-day measures, the patient is doing fairly well." (*Id.*) In October, Rienas reported to Dr. DeMuri that his medications helped to manage his mood, he denied having any major stressors, and felt that he coped sufficiently day-to-day. (Tr. 652–53.) Rienas declined the need for counseling. (Tr. 653.)

Rienas' treatment for both his physical and mental impairments was infrequent in 2015. In August, during his primary care appointment with NP Kunz, Rienas reported that he was "doing well at this time." (Tr. 642.) NP Kunz listed "doing well" by both "anxiety" and "depressive disorder." (*Id.*) In September, Dr. Dabrowski noted that Rienas continued to experience occasional anginal episodes. (Tr. 641.) He also noted that at times Rienas was able to be quite active without problem, but at other times, he experienced angina. (*Id.*) The angina episodes were not prolonged or sustained, however, and were usually resolved by moderating the pace of his activity. (*Id.*) In late October, Rienas treated with Dr. DeMuri, who noted that the medication helped Rienas manage both his depression and anxiety. (Tr. 638.) He noted that he copes sufficiently and has been working on a hobby. (*Id.*) Rienas' wife was present and concurred in the assessment. (*Id.*) Rienas again declined a counseling referral. (Tr. 639.)

In January 2016, while having an appointment scheduled with Dr. DeMuri, Rienas called to cancel, stating that he was doing well and would like to reschedule for March. (Tr. 639.) At his yearly follow-up with Dr. Dabrowski in February, the record notes that Rienas was doing fairly well and only experienced anginal symptoms with more significant forms of exercise. (Tr. 628.) Dr. Dabrowski noted that Rienas could now return in eighteen months. (*Id.*) At the March appointment with Dr. DeMuri, Rienas noted that his depression was "not

10

of major intensity, limited duration, intermittent frequency, [and] benefits with meds." (Tr. 623.) As to his anxiety, he reported no exacerbating stressor. (*Id.*) Rienas stated that he kept busy with his home routine, including looking after his grandchild. (*Id.*) Rienas' wife was present and concurred with the presentation. (*Id.*) Rienas again declined the need for a counseling referral. (Tr. 624.) During his annual examination with nurse practitioner Lynne Schilke on September 12, 2016, he denied having depression or anxiety. (Tr. 604, 607.) NP Schilke noted that since Rienas does not work, she "encouraged him to find something to do, to exercise or be active, volunteer, etc." (Tr. 607.) Several days later, however, while treating with Dr. DeMuri on September 19, Rienas reported feeling depressed most days over the last two weeks, experiencing loss of interest, attention and concentration deficits, low energy, negative thinking, and anxiety. (Tr. 600.) Given the "mood relapse," Dr. DeMuri recommended again adding Wellbutrin and returning to therapy. (Tr. 602.) In early October, Rienas reported to Dr. DeMuri "significant interval improvement" with the Wellbutrin and was keeping busy fishing, but noted his coping was "strained." (Tr. 597.)

On November 30, 2016, Rienas underwent a psychological consultation with Sarah Horine, PsyD. (Tr. 410.) His wife and grandchild were present at the appointment. (*Id.*) Both Rienas and his wife described Rienas' mental health history by stating that after his heart surgery, Rienas "came out a different person," becoming more secluded and anxious. (Tr. 411.) He reported that he enjoys watching television, "making ammo when he feels motivated," and had recently got a boat and hopes to take it out on Lake Michigan next summer. (Tr. 412.) Dr. Horine recommended Rienas engage in short-term, individual therapy to treat his depressive symptoms and scheduled him with Stacy Demerath, LCSW, to begin

individual therapy. (Tr. 415.) On December 16, 2016, Rienas reported to Dr. DeMuri that the Wellbutrin was beneficial. (Tr. 582.)

Rienas treated with Dr. DeMuri again on April 26, 2017. (Tr. 578.) As to depression, the record notes "no steady frequency or sustained duration of major intensity reported, finds medication beneficial." (*Id.*) In August, Dr. DeMuri reported that Rienas found his medication sufficiently beneficial and as to his anxiety, there was no steady frequency or sustained duration of major intensity reported. (Tr. 567.) Rienas treated with Demerath the same day. (Tr. 569.) Rienas' wife was present at the appointment, and she stated that Rienas was very impulsive, agitated, and lacked motivation to do anything unless his grandchild was present. (*Id.*) Demerath noted that "it may be best served for veteran's wife to either attend session 10 minutes in the beginning or end of session as he relies on her heavily to answer questions this writer has." (*Id.*)

In September, Rienas treated with Dr. Dabrowski, who noted that Rienas was again doing fairly well from a symptomatic standpoint. (Tr. 563.) While he continued to occasionally have anginal symptoms, it occurred when attempting a more significant amount of exertion. (*Id.*) For example, Rienas noted that the prior day he went to the water park and could only climb the stairs twice before he started to get neck pain and had to stop. (Tr. 566.)

On October 26, Rienas treated with both Dr. DeMuri and Demerath. (Tr. 555, 2082.) Dr. DeMuri noted that as to Rienas' depression, he found his medications sufficiently beneficial and as to his anxiety, there was no steady frequency or sustained duration of major intensity. (Tr. 555.) Rienas declined the need to adjust his medications. (Tr. 556.) Demerath noted Rienas' mental status examination was normal (Tr. 2082) but recommended that Rienas pursue non-VA treatment as the VA did not have providers trained in addressing his

12

goals and needs. (Tr. 2082–83.) During his annual physical examination in November, NP Schilke noted that Rienas denied depression or anxiety. (Tr. 552.)

The remainder of the relevant records post-date Rienas' date last insured of December 31, 2017. However, during 2018, Rienas treated infrequently with Dr. DeMuri and Dr. Dabrowski and during those treatment sessions, Rienas' mental health symptoms appeared controlled with medication, and he continued to deny experiencing anginal symptoms. (Tr. 509, 515, 518, 2054.) After Rienas' September 2018 appointment with Dr. DeMuri, he cancelled his scheduled January 24, 2019 appointment, stating that he would like to come back in six months. (Tr. 517.) Although he did end up rescheduling for March 2019, he reported only "residual" depression symptoms, noting that psychotherapy was beneficial, and that he was coping sufficiently. (Tr. 1986.) The next month, however, on April 4, 2019, Dr. DeMuri reported syndromal persistence of depression with limited medication benefit and outpatient psychotherapy of limited benefit. (Tr. 1976.) It was at this time that Rienas engaged in in-patient mental health treatment from April 23, 2019 through June 6, 2019. (Tr. 1876.)

Upon discharge, however, Dr. DeMuri again reported that Rienas found his mental health medications sufficiently beneficial in treating his anxiety and depression. (Tr. 3885.) Rienas resumed therapy with Dr. D'Angelo in July 2019. (Tr. 4124.) For the remainder of the records covering 2019 and 2020, his mental health treatment providers continued to note that Rienas' depression and anxiety benefitted from his medication and therapy. (Tr. 4223–24, 4229, 4239, 4260, 4263, 4277.)

On January 28, 2020, Dr. Dabrowski completed a "Statement of Capacities" form opining that Rienas should be limited to lifting and carrying ten pounds occasionally and five pounds frequently and should stand and walk only thirty minutes during an eight-hour day

due to his coronary disease. (Tr. 4053.) He stated these restrictions should be "back dated" to January 2017. (*Id.*)

3. *Application to this Case*

Although Rienas' medical records span nearly two decades, the period relevant to this case is March 3, 2012 through December 31, 2017. Rienas applied for disability insurance benefits; as such, he must prove that he was disabled by December 31, 2017, known as his "date last insured"—the date when he exhausted his earned quarters of coverage. *See Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010) (citing 42 U.S.C. § 423(c); 20 C.F.R. § 404.140). While "medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period," *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984), only "to the extent that it corroborates or supports the evidence from the relevant period," *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005).

With that legal standard in mind, Rienas argues the ALJ erred in three ways in finding him not disabled. First, he argues the ALJ erred by rejecting Dr. Dabrowski's January 28, 2020 opinion. (Pl.'s Br. at 3–10, Docket # 10.) Second, Rienas argues that the ALJ erred in assessing his mental impairments. (*Id.* at 10–14.) And third, he argues the ALJ failed to set forth a legally sufficient evaluation of his symptoms. (*Id.* at 14–16.) I will address each in turn.

3.1    Evaluation of Dr. Dabrowski's Opinion

As stated above, Dr. Dabrowski opined that Rienas should be limited to lifting and carrying ten pounds occasionally and five pounds frequently and should stand and walk only thirty minutes during an eight-hour day due to his coronary disease. (Tr. 4053.) Although this opinion was rendered well after Rienas' date last insured, Dr. Dabrowski specifically noted that it should be "back dated" to January 2017, prior to his date last insured. The ALJ found

14

Dr. Dabrowski's opinion unpersuasive. (Tr. 4342.) In so finding, he noted that the opinion was on a checkbox form without a written explanation. (*Id.*) He also found that while he indicated that it applies back to 2017, the opinion was provided well after the date last insured. (*Id.*) The ALJ also found that Dr. Dabrowski's own treatment notes did not support the opinion during the relevant period because Rienas often reported that he was doing fairly well and Dr. Dabrowski often found that Rienas' condition was stable and that he was doing satisfactorily. (*Id.*) The ALJ considered that Rienas had no further surgical interventions after 2011, that he had mild improvement in his ejection fraction, and that his stress test showed low average exercise tolerance. (*Id.*) Finally, the ALJ found that the opinion was inconsistent with Rienas' daily activities, which included shopping and managing his personal care. (*Id.*)

The crux of Rienas' argument is that the ALJ should not have limited him to light work; rather, he should have limited him to sedentary work consistent with Dr. Dabrowski's opinion. (Pl.'s Br. at 3.) Rienas contends that had the ALJ limited Rienas to sedentary work, he would be found disabled per the Medical-Vocational Guidelines as of his 50th birthday—May 15, 2017—prior to his date last insured. (*Id.*) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools and walking and standing only occasionally, meaning from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Social Security Ruling 96-9p; 20 C.F.R. § 404.1567(a). In contrast, light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds and requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

15

Rienas argues the ALJ failed to create a logical bridge between the evidence and his reasons for rejecting the opinion. (Pl's Br. at 4.) Specifically, he faults the ALJ for considering his doctor's use of a checkbox form, for noting that the opinion was rendered after the date last insured, by relying on the doctor's notations of "stability," by relying on improvement in test results, and by relying too heavily on his activities of daily living without noting his limitations in performing them. (*Id.* at 4–10.)

The ALJ's rejection of Dr. Dabrowski's opinion is well supported by the record. Pursuant to 20 C.F.R. § 404.1520c(c)(1), an ALJ should consider the supportability of a medical opinion in assessing its weight. And the supportability factor specifically states that the "more relevant the . . . supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Thus, it was appropriate for the ALJ to consider the fact that Dr. Dabrowski "did not support [his] opinion with an explanation" (Tr. 4342) in discounting it.

Nor was it improper for the ALJ to note that the opinion was rendered after Rienas' date last insured. The ALJ did not ignore the fact that Dr. Dabrowski "back dated" the opinion to January 2017, he specifically noted it twice in his explanatory paragraph. (*Id.*) And while Rienas correctly notes that Rienas treated with Dr. Dabrowski for at least a decade (Pl.'s Br. at 6), interestingly, despite consistently treating Rienas between 2012 and 2017, he only "back dated" the restrictions to January 2017. Nothing in the records, however, suggests a notable change between 2012 and 2017. Indeed, every year at the annual checkup, Dr. Dabrowski noted that Rienas was "stable," doing "fairly well," and had only occasional anginal episodes, usually corresponding with more strenuous physical exertion. (Tr. 563, 628,

641, 659, 689, 802.) And during the one checkup in 2017, in September, Dr. Dabrowski found that Rienas was "doing fairly well from a symptomatic standpoint" and only occasionally experienced anginal symptoms "when attempting a more significant amount of exertion." (Tr. 563.) While Dr. Dabrowski was concerned about his cholesterol levels at this appointment, it was addressed with a change in medication. (*Id.*) There is no indication that anything changed as to his ability to lift, walk, stand, or sit. In fact, the record suggests that Rienas was attempting "more strenuous level[s] of activity." (*Id.*)

Nor did the ALJ err in noting that Dr. Dabrowski's treatment notes consistently stated that Rienas was doing fairly well and that his condition was stable and satisfactory. Rienas argues that stability does not equate with the ability to perform full-time work. (Pl's Br. at 7–8.) But the ALJ does not equate the stability of his condition with the ability to do full-time work; rather, he cites the records to support the inconsistency between Dr. Dabrowski's opinion and his treatment records, as 20 C.F.R. § 404.1520c(c)(2) permits. While Rienas tries to paint the picture of Dr. Dabrowski merely being "fairly pleased" with the stability of a debilitating heart condition (*see id.*), that is not what the records show. Rather, Dr. Dabrowski notes on multiple occasions that Rienas only experienced anginal symptoms with "significant forms of activity" (Tr. 778) or when performing "very strenuous" activity (Tr. 659). Dr. Dabrowski noted in 2015 that Rienas could be "quite active without problem" at times. (Tr. 641.) In other words, Dr. Dabrowski's records show that Rienas was engaging in greater physical activity than what his opinion suggests. Beyond Dr. Dabrowski's records, during the relevant period, Rienas was both welding (Tr. 702) and going to a water park (Tr. 566). Although he claims he did experience neck pain symptoms at the water park, it was only after climbing the stairs twice. (*Id.*)

17

The ALJ did not err in relying on the inconsistency between Dr. Dabrowski's opinion and the lack of further surgery, mild ejection fraction improvement, a stress test showing low exercise tolerance, and his activities of daily living. (Pl.'s Br. at 8–10.) Rienas argues that the ALJ attempted to interpret the "raw testing findings," which he is unqualified to do. (*Id.* at 8.) But he is not interpreting the findings, he is simply noting that one test showed "improvement" and another showed he had at least a "low exercise tolerance." These are not complicated statements. Furthermore, the lack of need for further surgery simply corroborates the fact that Dr. Dabrowski consistently described Rienas as stable with infrequent anginal symptoms.

Finally, as to his activities of daily living, § 404.1520c(2) permits an ALJ to consider a medical opinion's consistency with evidence from other nonmedical sources in the claim; thus, the ALJ was permitted to consider Rienas' activities of daily living in assessing Dr. Dabrowski's opinion. While Rienas argues that the ALJ failed to consider the difficulty he experienced in performing daily activities such as shopping (Pl.'s Br. at 9–10), this is unsupported by the record. Once again, both Dr. Dabrowski's records as well as other record evidence indicates that Rienas was performing much more strenuous activities than Dr. Dabrowski's opinion would suggest, such as welding and going to a water park. During the relevant period Rienas was also caring for his very young grandchild (the records note in November 2016 she was four years old) (Tr. 410, 623, 692), specifically cancelling an appointment with his dietitian on one occasion because he was the only one home to watch his grandchild (Tr. 591). In other words, although Rienas contends that he simply "watched" his grandchild while his wife and son did the bulk of the work (Pl.'s Br. at 15), this is belied

by the record. Furthermore, Dr. Dabrowski's records indicate that when it came to the day-to-day activities, as opposed to the "very strenuous" ones, Rienas did just fine. (Tr. 659.)

For all these reasons, the ALJ's rejection of Dr. Dabrowski's opinion is well supported by the substantial evidence in the record. Remand is not warranted on this ground.

### 3.2    The Assessment of Mental Impairments

Rienas argues that the ALJ erred in assessing his mental impairments. (Pl.'s Br. at 10–14.) Rienas' case presents an interesting situation. ALJ Gendreau, in his first decision, found Rienas' depression and anxiety to be severe impairments during the relevant period between March 3, 2012 through December 31, 2017 (Tr. 83) and included mental impairment limitations in the RFC (Tr. 86). Upon remand, however, ALJ Gendreau reversed course, finding that Rienas' mental impairments of anxiety and depression were non-severe and, given he had no more than mild limitations in the "paragraph B" criteria, declined to assess any mental limitations in the RFC. (Tr. 4333–38.) The second decision covered the same period as the first decision; thus, the medical evidence did not change.

It is clear why this action would raise a red flag. There is no dispute that ALJ Gendreau was entitled to review the record *de novo* upon remand. In its remand order, the Appeals Council specifically vacated the previous decision and ordered the ALJ to reconsider Rienas' mental impairments. (Tr. 4384–85.) In the Commissioner of Social Security's "Hearings, Appeals and Litigation Law Manual" (commonly referred to as the "HALLEX"), ALJs are instructed that if the Appeals Council remands a case to the hearing level after a court remand, "it generally vacates the entire administrative law judge (ALJ) decision, and the ALJ must consider all pertinent issues de novo." HALLEX I-2-8-18, *available at*

19

http://www.ssa.gov/OP_Home/hallex/hallex.html (last visited Sept. 26, 2023). In other words, ALJ Gendreau was not bound by his previous decision.

That being said, it will create some skepticism when, like here, the ALJ dramatically changes the RFC after remand despite the medical evidence remaining the same. Consider the Seventh Circuit's decision in *Martin v. Saul*, 950 F.3d 369 (7th Cir. 2020). In *Martin*, the first ALJ found the plaintiff could perform a limited range of sedentary work; however, after the district court remanded the case for a more thorough consideration of plaintiff's mental health problems, a second ALJ found that plaintiff had no physical limitations whatsoever. *Id.* at 371. The court stated:

> What most concerns us is that the second ALJ did not grapple with the first ALJ's findings that [plaintiff] could perform only sedentary work. And that was so even though the second hearing entailed the presentation of no new evidence bearing on [plaintiff's] physical limitations. While the law may not compel a comparative analysis, we would have expected the second ALJ to explain the basis for reaching such a vastly different conclusion about whether [plaintiff's] physical condition affected the jobs she could perform.

*Id.* at 376.

In his second decision, ALJ Gendreau does not present an analysis specifically explaining why he changed course as to Rienas' mental limitations. But as the *Martin* court noted, the law does not compel such a comparative analysis. *Id.* And ALJ Gendreau's finding that Rienas' depression and anxiety are non-severe impairments is questionable. On the one hand, the decision is clear as to how he reached this conclusion. Section 404.1520a addresses how the SSA evaluates mental impairments and specifically states, "If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). The ALJ thoroughly

explains why Rienas was no more than mildly limited in the four "paragraph B" criteria and that he found the evidence did not otherwise indicate more than a minimal limitation in Rienas' ability to do basic work activity. (Tr. 4333–34.) Thus, citing § 404.1520a(d)(1), the ALJ appropriately concluded that Rienas' mental impairments were non-severe.

The issue, however, is that the Seventh Circuit has found that the Step Two determination is a "'*de minimis* screening for groundless claims' intended to exclude slight abnormalities that only minimally impact a claimant's basic activities." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (internal citation omitted). Rienas has undoubtedly been diagnosed with depressive disorder NOS and anxiety (*see, e.g.*, Tr. 974) and exhibited related symptoms over the relevant period, and the *O'Connor-Spinner* court has stated that "[w]e have not found a published opinion from any circuit in which an ALJ declared that major depression was not a severe impairment, although two unpublished decisions soundly reject this assertion," 832 F.3d at 697. Given the Seventh Circuit's statement that Step Two should be a *"de minimis* screening for groundless claims," it is understandable why an ALJ may feel compelled to err on the side of overinclusion of impairments rather than under-inclusion.

Even assuming, however, that ALJ Gendreau should have found Rienas' depression and anxiety to be severe impairments, the Seventh Circuit has also stated that Step Two is merely a threshold inquiry, "so long as one of a claimant's limitations is found to be severe, error at that step is harmless" because "[e]ither way, the ALJ must later consider the limitations imposed by all impairments, severe and non-severe." *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019).

In this case, ALJ Gendreau did not impose any restrictions in the RFC based on Rienas' non-severe impairments of depression and anxiety. This makes sense, because the ALJ determined that Rienas had no more than mild limitations in three of the four "paragraph B" criteria and no limitation in the remaining "paragraph B" criteria. (Tr. 4333.) As one court in this circuit noted, mild limitations in the "paragraph B" criteria do not necessarily require corresponding restrictions in the RFC. *Laura P. v. Comm'r of Soc. Sec.*, No. 22 C 7188, 2023 WL 5227413, at *3 (N.D. Ill. Aug. 15, 2023); *see also Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) (finding error when ALJ failed to account for moderate difficulties with concentration, persistence, or pace). Rather, the issue is whether the ALJ sufficiently created a logical bridge between the evidence and his decision not to include any mental impairment limitations. *See, e.g.*, *Cindy P. v. Kijakazi*, No. 20 C 6708, 2022 WL 2802328, at *4 (N.D. Ill. July 18, 2022) ("[C]ourts will affirm an ALJ's decision not to accommodate mild mental limitations in the residual functional capacity where the court can sufficiently trace the ALJ's reasoning for declining to include such limitations."); *Kathy A. v. Kijakazi*, No. 20-CV-2387, 2022 WL 2758001, at *4 (N.D. Ill. July 14, 2022) ("Even if a mild limitation finding at step two does not necessarily equate to any RFC limitation . . . the ALJ must still affirmatively *evaluate* the effect such mild limitations have on the claimant's RFC.") (internal quotations and citations omitted); *Jessica J. v. Kijakazi*, No. 21 C 05781, 2023 WL 3320287, at *4 (N.D. Ill. May 9, 2023) ("It is the ALJ's failure to conduct such an evaluation—and not the ALJ's failure to find any limitations—that requires remand.").

Rienas argues the ALJ failed to do so, arguing that the record does indeed support limitations due to his depression and anxiety, specifically ones addressing his irritability, violent behavior, arguing, problems presenting himself properly, and issues with being off-

task about fifty percent of the time with an inability to finish tasks and a propensity to jump from one task to another without finishing them. (Pl.'s Br. at 13; Pl.'s Reply Br. at 10.) Rienas acknowledges that the ALJ cites to both normal and abnormal findings throughout the relevant time period; but argues that the ALJ failed to assess the abnormal evidence and explain why it was outweighed by normal findings. (Pl.'s Reply Br. at 9.) Rienas further argues that the ALJ failed to explain why he was discounting his treating psychiatrist's opinion. (*Id.* at 10.)

I disagree. The ALJ provided a comprehensive summary and analysis of Rienas' mental health history, analyzing the medical records, the medical opinions, Rienas' testimony and statements, Rienas' wife's statements, and his activities of daily living. (Tr. 4333–37.) As to the mental health records, it is clear that Rienas experienced increased mental health symptoms after losing his job in early 2012. In May 2012, Dr. D'Angelo suggested increasing the frequency of therapy to address his increased depression (Tr. 790) and Dr. DeMuri adjusted his medications (Tr. 788). However, even during his most symptomatic in 2012, his mental status examinations were mostly normal. (Tr. 726, 742, 744, 776–77, 779, 786, 787, 789, 790.) Once into 2013, Rienas' mental health treatment became much less frequent, and he stopped therapy with Dr. D'Angelo altogether. Dr. DeMuri specifically noted that Rienas could resume counseling with Dr. D'Angelo "at his discretion" as needed. (Tr. 702.) Dr. DeMuri's records consistently indicated that Rienas maintained his self-care and that his medications helped to manage his mood. (Tr. 682, 701, 718–19.) Rienas' wife was noted to be present at two out of those three appointments and concurred with the presentation. (Tr. 701, 719.) In 2014, Dr. DeMuri's treatment notes showed his medications were managing his mood, that he was maintaining his self-care, that he denied having any major stressors, and

that he coped sufficiently day-to-day. (Tr. 652–53, 669, 674.) In October he specifically denied the need for counseling. (Tr. 653.) Once again, his wife was present and concurred with the presentation in two of those three visits. (Tr. 669, 674.)

Rienas' mental health treatment became even more sporadic in 2015 and when he did treat, the records indicated that he was doing well. (Tr. 638, 639.) In fact, in March 2016, Dr. DeMuri stated that Rienas' depression was "not of major intensity, limited duration, intermittent frequency, [and] benefits with meds" and his anxiety had "no exacerbating stressor." (Tr. 623.) Rienas' wife was also present at this appointment and concurred with the presentation. (Id.) Although he experienced an exacerbation of symptoms in September (Tr. 600–01), his medication was adjusted and by October he reported that he was doing better (Tr. 597–98). Rienas' wife was present at both of these appointments and concurred with the presentations. (Id.) Rienas continued to do well, reporting in December 2016 that Wellbutrin was beneficial for his depression. (Tr. 582.) During 2017, Dr. DeMuri's records again showed Rienas' depression and anxiety were of "no steady frequency or sustained duration of major intensity" and that the medications were beneficial. (Tr. 555, 567, 578.)

While Rienas faults the ALJ for failing to sufficiently explain why he credited the normal findings over the abnormal ones, the reason is fairly clear. It is difficult to understand how review of these medical records would produce any conclusion except that Rienas' mental health impairments were well-controlled with medication and were causing very little, if any, impact on his life. Years after the fact, Rienas argues that he was simply in denial regarding how bad he was doing and was untruthful with Dr. DeMuri as to his condition during that specific five-year period. (Tr. 4368, 4531–35.) He testified that it was not until reading a letter penned by his wife in 2022 that he truly understood the depth of his denial.

(Tr. 4360, 4372, 4560.) The ALJ considered this explanation, however, and rejected it, explaining that Rienas' wife was present at many of his appointments with Dr. DeMuri and concurred with his presentation of events each time. (Tr. 4334.) It is understandable that the ALJ would credit the plain language of the treatment records that consistently showed Rienas was doing well over his statement many years after the fact that he was in denial from 2012 through 2017.

Rienas also argues that the record evidence supports limitations due to his irritability, violent behavior, arguing, improperly presenting himself, and being off-task. But Rienas, not the ALJ, cherry-picks the records to support his argument. Rienas cites to two records during the relevant time period noting Rienas' mood as "mildly irritable" and "irritable." (Pl.'s Reply Br. at 9 n.4 (citing Tr. 776, 3514).) But there are only two, out of five years of records. As to his "violent" and argumentative behavior, Rienas points to his testimony that "there was a little bit of verbal abuse" towards his wife. (*Id.* at 10, citing Tr. 4372–73).) But the ALJ considered these statements and noted that the records consistently showed that his wife was present and supportive of him. (Tr. 4334.)

Rienas also claims he had trouble presenting himself appropriately, again pointing to his testimony that he "looked like a bum" so his wife did not want to go out with him to his appointments. (Pl.'s Reply Br. at 10, citing Tr. 4373–74).) But this is belied by nearly every single treatment record during the relevant period noting appropriate dress, hygiene, and grooming. (Tr. 555, 567, 569, 578, 582, 598, 600, 623, 638, 653, 669, 674, 682, 701, 719, 726, 742, 744, 777, 779, 786, 787, 789, 791, 2082.) As to his argument that he required an off-task limitation, Rienas points to his testimony that his wife says he never finishes anything and that he jumps from task to task (Pl.'s Br. at 13 and Pl.'s Reply Br. at 10, both citing Tr. 4376)

25

and a single record where Rienas reported difficulty with concentration and attention (Pl.'s Reply Br. at 9 n.4, citing Tr. 3299). But Rienas again cherry-picks the record, ignoring that every mental status examination showed normal concentration and memory, including the one in which Rienas reported difficulties. (Tr. 555, 567, 569, 578, 582, 598, 600–01, 623, 653, 669, 674, 682, 701, 719, 726, 744, 787, 791, 2082, 3299.) In other words, there is absolutely no support in the record for Rienas' alleged need for limitations in his RFC based on his mental impairments.

Further, beyond the mental health treatment records, the ALJ considered the medical opinions in the record in assessing no limitations. Again, Rienas testified that he "crashed and burned" when he was fired from his job in March 2012. (Tr. 4372.) However, in August 2012, when being evaluated for disability benefits through the VA due to mental impairments, Dr. Sherry opined that Rienas remained employable, and that employment would significantly benefit his mood because his sedate lifestyle was exacerbating his depression. (Tr. 776.) Rather than simply pointing to this opinion that very clearly supports not only Rienas' ability to work, but that working would actually benefit his mental health, the ALJ quite appropriately evaluated the opinion, noting that the VA has a different disability standard than the SSA and that an opinion as to whether one is able to work is reserved for the Commissioner. (Tr. 4335–36.) But the ALJ noted that Dr. Sherry's evaluation supported that despite having some mental health impairments, the impairments were mild. (*Id.*)

The ALJ similarly appropriately evaluated the opinions of the two State Agency consultants Jason Kocina, Psy.D. and Therese Harris, Ph.D. While Dr. Harris found the records were insufficient to opine as to any limitation because she thought the VA records ended more than a year prior to the date last insured (Tr. 71–72), the ALJ corrected this

26

misstatement of the record, noting that Rienas did treat through at least October 2017, but explained that the records showed normal mental status examinations and symptoms controlled by medication and therapy (Tr. 4335). The ALJ considered Dr. Kocina's findings of no limitations in two of the four "paragraph B" criteria and mild limitations in the remaining two areas, resulting in a determination that Rienas' mental impairments are non-severe (Tr. 57), noting that this determination was fairly consistent with the evidence showing conservative treatment of medication and therapy, normal mental status examinations, and statements that medication sufficiently controlled his mood (Tr. 4335).

While Rienas faults the ALJ for rejecting Dr. DeMuri's opinions, the ALJ's rationale is well-supported. Dr. DeMuri wrote two letters on Rienas' behalf, on April 17, 2013 and on June 19, 2019. (Tr. 720–21, 2479.) In the 2013 letter, Dr. DeMuri states that Rienas' mood makes it difficult to sustain daily function on an ongoing basis and that stress contributes to his exacerbations. (Tr. 720.) He opines that Rienas' functional productivity is decreased, that his mood is unstable, and that he can flare up frequently with or without stressful triggers. (*Id.*) Dr. DeMuri states that Rienas has coped very well up until this point, but that he believes his resilience is diminishing. (Tr. 720–71.) The 2019 letter, though shorter, for the most part mirrors the limitations expressed in the 2013 letter. (Tr. 2479.)

In finding these opinions unpersuasive, the ALJ explains that Dr. DeMuri's conclusions conflict with Dr. Sherry's opinion from the same time period as the earlier letter and conflicts with Dr. DeMuri's own treatment records showing normal mental status examinations and Rienas doing well with his medications. He explained that the opinion is ambiguous and unclear, noting that Dr. DeMuri does not explain what he means by "diminishing ability to cope with stress" or "decreased functional capacity." (Tr. 4336.) The

ALJ's assessment of these opinions is well supported by the record. Dr. DeMuri's assessment vastly differs from his findings as articulated in the medical records, as well as conflicts with Dr. Sherry's finding and Rienas' own statements to Dr. DeMuri on multiple occasions that he was coping well with the day-to-day. (R. 555, 578, 623, 638, 653.) For all of these reasons, the ALJ did not err in assessing no limitations for the non-severe mental impairments. Remand is not warranted on this ground.

### 3.3    Evaluation of Subjective Symptoms

Finally, Rienas argues that the ALJ improperly evaluated his subjective symptoms, specifically, by citing to his ability to brush his teeth, dress himself, prepare meals, shop, and watch his grandchild. (Pl.'s Br. at 14.) He also faults the ALJ for assigning little value to Rienas' wife's opinion, for considering the stability of his mental health symptoms while on medication, and for citing his lack of further heart surgery. (*Id.* at 15–16.)

In evaluating one's subjective symptoms, the regulations instruct ALJs to consider a number of factors, including: (1) relevant medical evidence, including intensity and limiting effects of symptoms, 20 C.F.R. § 404.1529(c)(2); (2) treatment and efficacy, *id.* § 404.1529(c)(3)(iv)-(v); (3) return to gainful activity, *id.* § 404.1571; (4) work during disability period, *id.*; (5) daily activities, *id.* § 404.1529(c)(3)(i); and (6) statements inconsistent with the record, *id.* § 404.1529(c)(4). An ALJ need not discuss every detail in the record as it relates to every factor. *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022). "Summaries of medical evidence, while definitionally 'partial and selective,' are appropriate." *Id.* However, while ALJs do not need to address every piece of evidence in the record, an ALJ may not ignore an entire line of evidence contrary to its ruling. *Id.* "As long as an ALJ gives specific reasons

supported by the record, we will not overturn a credibility determination unless it is patently wrong." *Id.* at 1279.

In his initial brief, Rienas seems to fault the ALJ for citing to pieces of evidence in support of his evaluation of the subjective symptoms that the ALJ is specifically permitted by the regulations to consider, such as medical evidence, the efficacy of treatment, daily activities, and the inconsistency of statements with the record. (Pl.'s Br. at 14–16.) In his reply, Rienas seems to clarify that, for example, his fault is not with the ALJ referring to the fact Rienas watched his grandchild, but in the ALJ's alleged failure to explain how performing this activity cut against Rienas' allegations of disabling symptoms. (Pl.'s Reply Br. at 6–8.)

I find the ALJ's explanations clear and well-supported by the record. As discussed extensively above, the medical records both as to Rienas' mental impairments and heart condition support the ALJ's RFC determination and the ALJ did not err in citing them. The ALJ also fully explained why he assigned little weight to Rienas' wife's letter, again as addressed in detail above. Finally, Rienas' daily activities very clearly undercuts his allegations of disabling symptoms. While Rienas argues that Rienas performed his daily activities with difficulty and the ALJ failed to consider this, that is not what the record reveals. Again, as stated above, during the relevant period, Rienas both welded (Tr. 702) and went to a water park (Tr. 566). He was watching his very young granddaughter on his own (Tr. 591) and had bought a boat and planned to go sailing (Tr. 412). It was entirely proper for the ALJ to consider all of this evidence in discounting Rienas' claims of disabling symptoms. The ALJ's decision in this case is far from "patently wrong"; it is well supported by the evidence in the record. Thus, the ALJ did not err and remand is not warranted on this basis.

**CONCLUSION**

Rienas argues that the ALJ erred in determining that he was not disabled. I find the decision is supported by substantial evidence and affirm. The case is dismissed.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of September, 2023.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge